Junius Irving SCALES, Appellant,

v.

UNITED STATES of America, Appellee.

No. 7016.

United States Court of Appeals Fourth Circuit.

Argued Oct. 4, 1955.

Decided Nov. 7, 1955.

David Rein, Washington, D. C., for appellant.

Edwin M. Stanley, U. S. Atty., Greensboro, and Kevin T. Maroney, Atty., Department of Justice, Washington, D. C. (William F. Tompkins, Asst. U. S. Atty., ton, D. C., on the brief), for appellee. John H. Davitt and William G. Hundley, Attys., Department of Justice, Washing-

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal in a criminal case by a defendant who has been convicted of violation of section 2 of the Smith Act of June 28, 1940, 54 Stat. 670, 671, 18 U.S.C.A. § 2385. That section, as brought forward in the United States Code, is as follows:

> "Whoever knowingly or willfully advocates, abets, advises, or teaches

the duty, necessity, desirability, or propriety of overthrowing or destroying the government of the United States or the government of any State, Territory, District or Possession thereof, or the government of any political subdivision therein, by force or violence, or by the assassination of any officer of any such government; or

"Whoever, with intent to cause the overthrow or destruction of any such government, prints, publishes, edits, issues, circulates, sells, distributes, or publicly displays any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence, or attempts to do so; or

"Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence; or becomes or is a member of, or affiliates with, any such society, group, or assembly of persons, knowing the purposes thereof—

"Shall be fined not more than $10,000 or imprisoned not more than ten years or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction."

The indictment, which was returned on November 18, 1954, charged that the Communist Party of the United States of America has at all times been "a society, group and assembly of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit" and that the defendant Scales "had been a member of said Communist Party from January 1946 up to the filing of the indictment well knowing during all of said period that said Communist Party of the United States of America was and is a society, group, and assembly of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit, and said defendant intending to bring about such overthrow by force and violence as speedily as circumstances would permit."

■ The evidence in the record amply sustained the charge in the indictment. There was evidence, similar to that in United States v. Dennis, 2 Cir., 183 F.2d 201; Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, and Frankfeld v. United States, 4 Cir., 198 F.2d 679, to the effect that the Communist Party advocates the overthrow of the Government of the United States by force and violence. It was admitted that defendant Scales was a member of the party during the period covered by the indictment and was chairman of the North and South Carolina District of the party; and there was ample evidence that he knew of its purpose to overthrow the government by force and violence, that he approved of that purpose and that he had so expressed himself to witnesses who testified on the trial.

The case was submitted to the jury in a charge which clearly excluded any possibility of "guilt by association". The jury was expressly instructed that, before there could be a conviction of defendant, four things must be proved beyond a reasonable doubt: (1) That the Communist Party of the United States was a group teaching or advocating the destruction or overthrow of the Government of the United States by force and violence, (2) that the defendant was a member of the party, (3) that, while a member of the party, he well knew of its teachings and purposes and (4) that he himself intended to bring about the overthrow of the Government of the United States by force and violence. In addition to this the trial judge carefully explained that the defendant could not be convicted merely because he was a member

of the Communist Party but only upon a finding that he knew of and participated in the purpose of the party to overthrow the government by force and violence, saying:

"First, it is not criminal for any person or group to hold or express the belief that the Government of the United States should be completely changed. It is not criminal for any person or group to have such a change of government as a purpose or aim. It is not criminal to publicly advocate and urge such a change by peaceable and constitutional means. It is not criminal to criticize the Government and its policies, foreign and domestic, or to praise the policies of other governments, and this is true regardless of whether you agree or disagree with the truth or falsity of such criticism or praise. Nor is it criminal for the Communist Party or anyone else to teach that should a change in our form of government be made and accomplished by peaceable and constitutional means, and thereafter the new government should be resisted by force and violence, then the new government would be justified in using force and violence to subdue such resistance; that is, if the change had been made by peaceful and constitutional means, the new government would have the right to protect itself against any other change save by peaceful, constitutional means.

"You cannot convict the defendant merely because he was a member or an officer of the Communist Party, no matter what were the principles and teachings of the Party; for membership alone is not a crime. Moreover, the teaching in the abstract, or teaching objectively, that is, teaching, discussing, explaining or expounding, what is meant by the aim or purpose of any group or society of overthrowing the Government by force and violence, is not criminal. For example, study and discussion by the Communist Party or in school classrooms, or study groups, or public meetings, with the object of informing the participants or the audience of such aims and purposes of the doctrines of Marx, Lenin or Stalin, is entirely lawful. But it is criminal to advocate or urge the overthrow by force or violence of the Government at the opportune time. * * *.

"It is in this understanding, and in this understanding only, that you must determine whether the evidence shows beyond a reasonable doubt that the Communist Party of the United States of America was a group or society teaching and advocating the overthrow and destruction of the Government by force and violence as soon as permitted. If you are not convinced beyond a reasonable doubt that the Communist Party of the United States was such a group, that is, a group that urged and advocated the overthrow, then you can not find the defendant guilty and should acquit him without consideration of the remainder of the elements of the crime.

"But, on the other hand, if you believe beyond a reasonable doubt that the Communist Party was such a group, then you should next consider whether the defendant, Scales, was a member or affiliated with the Party and the Court tells you, by the way, that that is admitted; he admits that he was a member of the Party. You must consider, secondly, whether he had knowledge of the aims and purposes of this Party, and, thirdly, whether on his part, he specifically intended to accomplish the overthrow of the Government by force and violence as soon as practicable.

"To emphasize those points: To be punishable, the membership must have been within the period of November 18, 1951, to November 18, 1954. Earlier membership would not be covered by this indictment.

It is barred, as not punishable, by the Statute of Limitations.

"Knowledge by the defendant of the Party purposes must accompany the membership in order for the membership to be criminal, and that knowledge too must have existed during the three-year period.

"And a specific intent, as I have already indicated to you, on the part of the accused to bring about the overthrow of the Government is also necessary and an indispensable requisite of the offense. Again, the intent must have existed during the three-year period.

* * * * * *

"If you have found beyond a reasonable doubt that the Communist Party of the United States was a group or society teaching or advocating the overthrow of the Government by force and violence at the propitious time, but you are not convinced beyond a reasonable doubt that the defendant knew of its purposes, or you are not convinced that he himself had the intent to accomplish that purpose, then you must find him not guilty, because those elements are just as indispensable to the offense as the aims and purpose of the Communist Party."

The principal contentions of defendant upon this appeal are: (1) that the act under which he is indicted is unconstitutional and void; (2) that prosecution of the offense charged is barred by section 4(f) of the Internal Security Act, 50 U.S.C.A. § 783(f); and (3) that the court erred in admitting and allowing the jury to consider evidence tending to show the purpose of the Communist Party to overthrow the government by force and violence, where such evidence did not consist of statements made by defendant or in his presence or related to matters occurring prior to the three year limitation period preceding the finding of the bill of indictment. Other points of minor importance are raised relating to the regularity and fairness of the trial which have been duly considered and which will be referred to after we have dealt with these three principal questions.

### 1. The Constitutionality of the Statute.

The portion of the statute here applicable is the third paragraph of section 2385 of Title 18 of the United States Code Annotated, quoted above, relating to membership in a group advocating the overthrow of the government by force and violence by one who becomes or remains a member thereof knowing of its criminal purposes. In the light of the decisions in the Dennis and Frankfeld cases, supra, we think there can be no doubt as to the constitutionality of this provision of the statute. It is said that those cases related to conspiracy; but the conspiracy charged was conspiracy to violate the statute and the validity of its provisions was necessarily involved and was expressly passed upon in the light of the same arguments relating to "guilt by association" and "'clear and present danger'" that are made here. In the Frankfeld case, 198 F.2d at pages 683–684, we said:

"Defendants argue that, even though the Smith Act be not unconstitutional in its entirety, the 'membership' and 'literature' provisions of the act must be held invalid and that this invalidates their conviction, since violation of these provisions was charged as being among the objects of the conspiracy. What was said by the Supreme Court in the Dennis case is a sufficient answer to this argument. There is no distinction in principle between advocating through the printing and distribution of literature the destruction or overthrow of the government and advocating it by word of mouth. So far as 'membership' in an organization advocating such destruction or overthrow is concerned, such membership is condemned only where there is knowledge on the part of the accused of the unlawful purpose of the organization. Membership in an organization renders aid

and encouragement to the organization; and when membership is accepted or retained with knowledge that the organization is engaged in an unlawuful purpose, the one accepting or retaining membership with such knowledge makes himself a party to the unlawful enterprise in which it is engaged. Certainly it is within the power of Congress to forbid the circulation of literature advocating the forcible overthrow or destruction of the government or membership in an organization having such destruction as its purpose, where there is knowledge of such purpose on the part of one accepting or retaining such membership.

"The defendants contend that these provisions of the statute are unconstitutional because they do not require a 'clear and present danger' as a condition of criminality; but it would be little short of absurd for a statute to forbid advocacy of the destruction of the government or membership in an organization formed for the purpose of such advocacy only in the event that they result in 'clear and present danger'. This would be to make the near success of an attempted crime the criterion of criminality for making the attempt."

The membership clause of the statute is, of course, nothing more nor less than a statute denouncing and making criminal a conspiracy to overthrow the government by force and violence. It is elementary that a conspiracy is a parnership in criminal purposes and that all are guilty who join it with knowledge of such purposes; and all that the statute does is apply this fundamental concept of conspiracy to an organization having for its purpose the forcible overthrow of the government. This was considered in the Frankfeld case, 198 F.2d 689, where we said: "If it be argued that the crime defined by section 2(3) is in essence the crime of conspiracy, the position of the defendants is not helped; for the result would be merely that such conspiracy is thus made criminal by two sections of the act." As the effect of the membership clause is to define as well as make criminal a conspiracy to overthrow the government, all that was said in the Dennis and Frankfeld cases as to the validity of the statute is pertinent here. In the Frankfeld case, 198 F.2d 682, we said:

"The question presented is not one as to freedom of speech or as to the right to organize for proper political purposes, but goes to the power of the government to outlaw and punish conspiracies whose purpose it is to overthrow the government itself by force and violence. Modern history is replete with instances of the danger to the government inherent in such conspiracies; and there is nothing in the Constitution or in any sound political theory which forbids it to take effective action against that danger. If it may take action to protect itself from being overthrown by force and violence, it necessarily follows that it may forbid conspiracies having that end in view and may punish such conspiracies as criminal. In the absence of conspiracy the 'clear and present danger' rule may furnish a satisfactory criterion of criminality in the case of ordinary speeches advocating force and violence; but such rule has no practical application to advocacy of violence in connection with conspiracies to overthrow the government, for the danger of such conspiracies is ever 'clear and present'. They are pregnant with potential evil, which, while hidden from view in normal times, is likely to assert itself as an irresistable force when some national crisis presents an opportunity for a putsch or a coup d' etat."

In the Dennis case [341 U.S. 494, 71 S.Ct. 867], the late Chief Justice Vinson, speaking for the Supreme Court, answered in the following language the argument that the statute must be held

invalid in application of the "'clear and present danger'" rule:

"Obviously, the words cannot mean that before the Government may act, it must wait until the putsch is about to be executed, the plans have been laid and the signal is awaited. If Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby they will strike when the leaders feel the circumstances permit, action by the Government is required. The argument that there is no need for Government to concern itself, for Government is strong, it possesses ample powers to put down a rebellion, it may defeat the revolution with ease needs no answer. For that is not the question. Certainly an attempt to overthrow the Government by force, even though doomed from the outset because of inadequate numbers or power of the revolutionist, is a sufficient evil for Congress to prevent. The damage which such attempts create both physically and politically to a nation makes it impossible to measure the validity in terms of the probability of success, or the immediacy of a successful attempt. * * *

"Likewise, we are in accord with the court below, which affirmed the trial court's finding that the requisite danger existed. The mere fact that from the period 1945 to 1948 petitioners' activities did not result in an attempt to overthrow the Government by force and violence is of course no answer to the fact that there was a group that was ready to make the attempt. The formation by petitioners of such a highly organized conspiracy, with rigidly disciplined members subject to call when the leaders, these petitioners, felt that the time had come for action, coupled with the inflammable nature of world conditions, similar uprisings in other countries, and the touch-and-go nature of our relations with countries with whom petitioners were in the very least ideologically attuned, convince us that their convictions were justified on this score. And this analysis disposes of the contention that a conspiracy to advocate, as distinguished from the advocacy itself, cannot be constitutionally restrained, because it comprises only the preparation. It is the existence of the conspiracy which creates the danger. Cf. Pinkerton v. United States, 1946, 328 U. S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489; Goldman v. United States, 1918, 245 U.S. 474, 38 S.Ct. 166, 62 L.Ed. 410; United States v. Rabinowich, 1915, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211. If the ingredients of the reaction are present, we cannot bind the Government to wait until the catalyst is added."

In his concurring opinion in the Dennis case, the late Mr. Justice Jackson pithily observed:

"But it is not forbidden to put down force or violence, it is not forbidden to punish its teaching or advocacy, and the end being punishable, there is no doubt of the power to punish conspiracy for the purpose.

* * * * * *

"There is no constitutional right to 'gang up' on the Government."

"Guilt by association" is not punished by the statute; for knowledge of the criminal purpose of the organization is made a condition of guilt in joining it. The "'clear and present danger'" rule has no application to the statute, since what the statute denounces is a conspiracy to overthrow the government by violence; and Congress may unquestionably forbid incitement to crime and organization for that purpose and may make such organization criminal, irrespective of the immediacy of the danger resulting from such organization.

2. Effect of the Internal Security Act.

Defendant relies upon section 4 (f) of the Internal Security Act otherwise known as the Subversive Activities Control Act of 1950, 64 Stat. 987, 991, 50 U.S.C.A. § 783(f), which provides: "Neither the holding of office nor membership in any Communist organization by any person shall constitute per se a violation of subsection (a) or subsection (c) of this section or of any other criminal statute." The purpose of this provision, as defendant correctly argues, was to insure the enforceability of the registration provisions of the act by making the privilege against self incrimination unavailable as a defense to failure to register. The language of the section relied on, however, provides merely that neither holding of office nor membership in a Communist organization shall constitute per se a violation of a criminal statute. It does not purport to exempt from criminal liability membership in an organization advocating the overthrow of the government by force and violence where such membership is acquired or held with knowledge of the criminal purpose in which the organization is engaged. In other words, mere membership in the party is not a crime. Membership with knowledge of the criminal purpose of the organization remains a crime.

Whether the effect of the language used is to make the privilege against self incrimination unavailable to those who fail to register as required by the act, we need not stop to inquire. It is clear that the language used does not exempt from criminal prosecution members of the Communist party who hold membership in the organization with guilty knowledge of its criminal purpose to bring about the violent overthrow of the government. Even though the Communist Party has such purpose, membership per se is not made a crime under the Smith Act; and it is only membership per se, which is exempted from criminal prosecution under section 4(f) of the Internal Security Act. That no modification of the provisions of the Smith Act was intended by Congress in the passage of the Internal Security Act of 1950 is made abundantly clear by section 17 of the Internal Security Act, 64 Stat. 1003, 50 U.S.C.A. § 796, which provides: "The foregoing provisions of this title shall be construed as being in addition to and not in modification of existing criminal statutes". In view of this interpretation which Congress itself placed on the statute at the time of its passage, there is no occasion for further discussion as to its effect upon the Smith Act. The charge of the court, heretofore quoted, made it clear that defendant could not be convicted because of mere membership in the party.

3. The Evidentiary Questions.

Defendant complains that the trial judge admitted and allowed the jury to consider evidence relating to the aims and purposes of the Communist Party by documents and teachings with which he was not connected, that some of this related to aims and purposes other than the use of force and violence and that a considerable part of it related to publications and teachings prior to the three year limitation period preceding the finding of the indictment. We think that this complaint is entirely without merit. The evidence as to the teachings carried on by the party and the documents used in the teaching was clearly competent to show the aims and purposes of the party; that which related to infiltration, subversion and the arousing of dissension had a direct bearing on the purpose to overthrow the government by force and violence when a favorable opportunity should present itself; and the fact that some of the evidence related to the period preceding the limitation period was no objection to its admissibility, since there was no evidence of any change in the aims and purposes of the party in the meantime and the evidence introduced clearly indicated that there had been no such change. Of course, the defendant could not be convicted unless he was shown to have had knowl-

edge of its aims and purposes and the jury was clearly so instructed; but there was ample evidence to establish such knowledge on his part. Aside from the fact that he was chairman of the party in North and South Carolina and on account of his position is reasonably presumed to have known its aims and purposes, there is direct evidence that he did have such knowledge. Thus, in a conversation with the witness Clontz, when Clontz, after reading the communist literature advocating revolution which defendant had furnished him, inquired whether communism could not be brought to the people of the United States through a process of education, defendant replied in the negative and said that the use of force was the only answer. Clontz' testimony with respect to this conversation is as follows:

"Additionally then I posed to Scales the question, If you can have a publishing company and if Communism is the better form of government and the better way of life, why can't we bring Communism here to the United States by educating the people, by showing them that this is the best form of government?

"Scales answered me that that was entirely fallacious, that that would never work, that in the first place the Government of the United States owned all the media of communication, the newspapers, * * the—I don't believe he mentioned television—but the newspapers and radio and other similar mediums; they controlled the schools, the other institutions of Government and that they would not permit the masses of people to learn the truth about this Communism, that in order to get the truth to the people you would first have to destroy the Government and destroy the mediums of communication control and destroy the institutions of Government, that Stalin and his followers had proved conclusively that ideas alone would never change the form of government or would never do anything. He said that it would be nice if revolution happened automatically but, he said, that unfortunately they didn't, that a small militant force had to bring about a change in government by revolution.

"I recall he said that that is where we, the Communist Party, come in. He said that Engels, the philosopher of some kind, that collaborated with Karl Marx, had felt that when the revolution comes about, Government would just disintegrate and the people would just sort of run things very loosely. He said that Lenin had proved that that didn't follow, that when the revolution took place in the Soviet Union in Russia, that Lenin had taken the police power, that the Czar had used that police power to consolidate his position and as Junius put it, to protect the masses of the people from the encroachment of the foreign capitalist countries that would try to come in and prevent the revolution.

"Scales said, and it made quite an impression on me, that force is the only answer, that ideas alone can never accomplish anything.

"That was the substance of our conversation at that time."

In a later conversation with Clontz on the subject of what aid could be expected from the Soviet Union in case of revolution, defendant said, according to Clontz' testimony:

"I recall during one of these meetings in the spring of 1950 Scales brought up the question of permanent revolution. Permanent revolution was defined by Scales as the concept that the Soviet Union and the Communist Party in the Soviet Union were not through with their job after they had achieved Socialism. In the Soviet Union they had a continuing obligation. He said that when the Soviet Union Communist Party had brought about

a revolution and had brought Socialism there to the Soviet Union, they still were obligated under Stalin's teachings and under common sense, as he put it, to continue assisting the Communist Party all over the world until they had overthrown the capitalist governments including that of the United States that would threaten Communists, Communism and Socialism, unless they were overthrown.

"Now I asked Scales, Does that mean that when the day of the revolution comes, Soviet Union is going to land troops?

"Scales' answer to that was that as a practical matter the Soviet Union would not land troops at the commencement of the revolution, that the Communists here in the United States would have to start the revolution themselves. He pointed out that the Communist Party in the Soviet Union had learned through experience in China that direct Soviet Union guidance immediately in the form of leadership was not desirable. He said they sent a general over to China during the time the Chinese Revolution was taking place, and this Russian General that was sent over by the Communist Party resulted in having the troops completely routed, that Mao, the Chinese leader there in China had never been to the Soviet Union in his life at that period of time in 1950, but that instead the Soviet Union had sent political advisors over to educate him in the proper Communist technique, and had furnished them assistance through their military advisers and that sort of thing. He said that once the revolution was started, if it began to look as though the police power of this country would be used against the working class in the Communist Party, then certainly the 'mother country' as he called the Soviet Union, could not stand by

and see that happen but would have to land troops to protect us."

Defendant did not take the stand to deny either of these statements or to testify to any change of views on his part. Standing uncontradicted, they clearly established knowledge by defendant of the unlawful purposes of the party within the limitation period as well as prior thereto, since the running of the statute of limitations cannot empty a man's mind of knowledge of this sort. When defendant remained chairman of the party in the North and South Carolina district during the limitation period, he did so with clear knowledge of its purposes, as revealed in these conversations. Added to this is the testimony of Clontz that in December 1951, within the limitation period defendant informed him that he, the defendant, was going "underground" and that, on the orders of the party, Clontz was not to use the telephone, the telegraph or the mails in communication with him.

 It was not necessary to his guilt that the defendant take part in the teaching or have a hand in the preparation of the documents of the Communist Party or even that he be shown to be familiar with the documents. All that it was necessary to show was that the party did advocate the overthrow of the government by force and violence and that he became or remained a member during the period not barred by the statute of limitations with knowledge of that unlawful purpose. The evidence objected to on the ground that it was res inter alios acta was clearly competent to establish the unlawful aims and purpose of the party. With respect to that which showed knowledge prior to the statute of limitations, this was clearly competent as scienter and intent were elements of the offense. See United States v. Mesarosh 3 Cir., 223 F.2d 449; United States v. Schneiderman, D.C., 106 F. Supp. 892, 897. There can be no question but that the evidence objected to is competent in a conspiracy case. See United States v. Flynn, 2 Cir., 216 F.2d 354; Short v. United States, 4 Cir., 91

F.2d 614, 618; Comeriato v. United States, 4 Cir., 58 F.2d 557, 558. And as pointed out above, a charge under the membership clause of the Smith Act is a charge of conspiracy. There is no magic in the use of the word "conspiracy" or "conspire"; and to charge that defendant became or remained a member of an organization advocating the forcible overthrow of the government is to charge that he became a party to an unlawful conspiracy for the purpose and makes applicable the rules relating to proof of guilt in joining a conspiracy.

4. Other Contentions.

Other contentions of defendant may be dealt with briefly. The contention that the evidence was not sufficient to sustain the verdict is manifestly so lacking in merit, in view of what has been said, as not to warrant further discussion. The requested prayers for instruction were properly declined as the law was fully covered in the court's charge in a light as favorable to the defendant as could possibly have been given, and the requested instructions would have served no purpose except to confuse the jury. The government's summation did not exceed the comment that is reasonably to be expected in jury arguments and the trial judge expressly instructed the jury that "the statements and arguments of the attorneys do not constitute evidence in the case." It is elementary that whether a mistrial shall be declared because of arguments of counsel is a matter resting in the sound discretion of the trial judge; and, certainly, there was no evidence of any abuse of discretion here.

The defendant's challenge to the grand jury on the ground that the clerk of the court and the jury commissioner had delegated their functions to others is without merit. The fact that they asked leaders of various organizations to furnish them with names of persons qualified to serve as jurors is unimportant so long as they themselves made the decision as to what names should go in the box. There is nothing to indicate that the persons whose names were placed in the jury box did not represent a fair cross section of the community or that defendant was prejudiced in any way by the method of selection. The questions propounded by the judge to the trial jury on the voir dire were sufficient for the selection of an impartial jury and that was all that defendant had a right to ask. The form of the questions to be propounded for that purpose is a matter resting in the discretion of the trial judge. United States v. Dennis, 2 Cir., 183 F.2d 201, 226. Defendant complains because the judge did not excuse for cause three of the jurors who were subsequently peremptorily excused in the exercise of defendant's right to strike. The judge found, however, that these were impartial jurors and we would not be justified in setting aside his finding with regard thereto. Reynolds v. United States, 98 U.S. 145, 156, 25 L.Ed. 244.

Defendant complains because the judge denied his request that his counsel be furnished with F.B.I. reports to the Department of Justice as to statements of the witnesses Clontz and Childs and that the selective service file of Childs be produced for examination by his counsel. These requests were properly denied. As to the F.B.I. reports on the statements of Clontz and Childs, there was no suggestion that they contained anything contradictory of testimony given by these witnesses on the trial, and the trial judge, who examined the statements, held that there was nothing in them contradictory of that testimony. There is nothing in the Constitution or elsewhere that permits a defendant to conduct a fishing expedition of the sort here proposed. The Constitution guarantees to a defendant accused of crime the right to be confronted by the witnesses against him, not the right to rummage through the secret files of the government in the hope that he may possibly find something contradictory of such witnesses. The same

may be said with added force as to the selective service file of Childs, where the purpose was to rummage through a confidential file of the government in the hope of finding something that might contradict a witness as to a collateral matter. There is nothing to the contrary in Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447. There a key witness for the government had admitted on cross examination that he had given statements contradictory of his testimony to government agents and that sentence on him had been withheld for complicity in the same crime by the judge who advised him to tell the whole story to the probation officers even though it might involve others. The decision was limited to the narrow case thus presented and expressly distinguished from "any broad or blind fishing expedition among documents possessed by the Government on the chance that something impeaching might turn up", see 344 U.S. at pages 418–419, 73 S.Ct. at page 373, which is the case here.

The defendant had a fair and impartial trial before an able and experienced trial judge. He was shown to be not only a member but also the chairman for the North and South Carolina District of the Communist Party, an organization shown to be an organization advocating the overthrow of the Government of the United States by force and violence, and held to be the basis of the criminal conspiracy charged in the Dennis, Frankfeld, Flynn, Mesarosh and Schneiderman cases, referred to above. Uncontradicted testimony as to statements by him showed that he was thoroughly aware of the unlawful aims and purposes of the party, was in sympathy with those aims and purposes and entered into its activities with complete understanding of what was involved. On the evidence before it, the jury was amply justified in finding him guilty of the crime charged; and we find nothing in the record which would justify us in awarding a new trial.

Affirmed.